Tuesday, April 25, 1809.
JUDGE TUCKER
(after stating the case as above)
proceeded:
That John Musgrove, the son of William, (or Smith his administrator,)had an equitable title to a lease from Robert Carter, for the lives of himself and Valender Mus-grove, is, I think, fully proved, by the answer of Robert Carter, the deposition of Nathaniel Smith, and that of Benjamin Dawson; and that, until January, 1788, when John Musgrove came of age, no laches is imputable to him, for not taking some steps to procure a legal title to such a term. *'But, from that period it is imputable to him; for in agreements of this nature, both parties are agents. It was therefore equally incumbent upon John Musgrove to demand a lease, as upon Robert Carter to tender one. Eighteen months elapsed before Charles *721 Carter became the purchaser; and in all that time, nothing was done by Musgrove towards obtaining a lease. He does not even appear to have given Charles Carter notice of his claim. But in September, 1791, three years and a half a fter he became of age, and two years after Charles Carter had purchased the land, without any communication with, or license from him, he sells the lot to the complainant Roberts, puts him in possession, and makes him a deed, which is found among the exhibits; recites the nature of Musgrove’s claim; and must have given the complainants full notice, if such notice had not also been proved by Nathaniel Smith in his first deposition. Roberts then was a purchaser with full notice of the nature of Mus-grove’s title. Now, although Musgrove had an indubitable claim upon Robert Carter for a lease, when he came of age to demand it; it was a mere equitable title that he had to one, and that subject to all the covenants and conditions which it was mutually understood between William Musgrove, the father, and Lia.no, the agent of Robert Carter, were usually inserted in the leases which he granted. Among these was a covenant or condition against alienation without license, by which condition, William Musgrove and after his death John his son, were equally bound in equity as Robert Carter was to grant the lease for the three lives. Roberts had, or must be presumed to have had, full notice of all this when he bought the lot and took an assignment of John’s right. John Musgrove therein engages to give every assistance in his power to Roberts, towards obtaining a lease. Why did not Roberts apply to Charles Carter for a lease, during the two years that intervened between his taking this assignment, and the levying the elegit upon the lands? And why did he not apply or make known his claim, either to Charles Carter, or Mr. Pendleton, for eig-hteen months after; and before Mr. Jones *had become a purchaser from Carter; and a still longer period before he purchased the right of the tenant by elegit? Lastly; why did he not shew the deed of assignment from Musgrove to Mr. Jones, when ^requested to communicate his title? but, on the contrary, why did he studiously and mysteriously conceal ii? Was it that he might drive him to bring an ejectment, and when he had got a judgment against him for his lands, conjure up this dormant equity, the evidence which he slept for near twenty years, for the purpose of saddling him with the whole expense of a suit at law, and another in equity? This wilful concealment on his part, in my opinion, ought not to operate to his advantage, and to the vexation, delay, and injury of a person pursuing his legal rights, without knowledge of this dormant equity, and without the possibility of discovering it by his now researches and exertions. No fraud, collusion, neglect, or other fault whatsoever, is imputable to Mr. Jones in the whole transaction; yet, (if I understand the course of the Court of Chancery, though not expressed or even noticed in the decree,) may he be condemned to pay the costs of both suits. The rule caveat emptor, applies to legal, not to latent, and much less to wilfully concealed, equitable rights, (a) Had the complainant made known the nature of his claim to the defendant, when he desired it, and proposed to come upon terms, all the trouble, expense, and delay, which have ensued from his refusal would probably have been avoided. Having defended his title' at law, instead of acceding to so reasonable a proposal, or at once bringing his bill for a lease, I conceive that he is not entitled at this day to the aid of a Court of Ejquity; his own conduct throughout being a violation of its rules.
But this is not the only ground on which I think Roberts not entitled to the aid of a Court of fSquitj'. Being the purchaser of an equitable title only, with full, or, at least, strong presumptive notice, that the tenant was restrained from alienation without license. No equivocal act of a *fair purchaser, for a valuable consideration, of the fee-simple estate, not having notice of the nature of his title, ought to have any effect upon his case, unless it shall appear to the satisfaction of the Court that such act could not have been done diverso intuitu from that which is contended for. The acceptance of rent from the alienee, or assignee of a tenant who is restrained from alienation without license, is one of those equivocal acts, which may, or may not, amount to a recognition of his title, and a waiver of the forfeiture, according to circumstances. Roberts purchased at the very time that Mr. Pendleton sued out his first and second writs of elegit, and though neither of these writs were levied upon the lot in question, it no where appears that he ever paid any rent to Charles Carter, nor indeed to Mr. Pendleton; all the receipts taken, up to the 21st of February, 1795, which was after Jones’spurchase from Charles Carter, being in the name of Nathaniel Smith, who, as administrator of William Musgrove, had paid the rent for the space of nearly one and twenty years before; the first receipt to him bearing-date March 13th, 1774. The acceptance of rent by Mr. Jones himself (as stated in the bill itself, and therefore need not be proved on his part) was on a condition that it should not affect his tille, (b) The presumption that the rent was accepted from Roberts, with a full notice of the nature of his title, is thus completely done away; and having gained a possession contrary to the equitable condition annexed to Musgrove’s title, of which he must be presumed to have had full notice, he is to be regarded as a mere tenant at sufferance, or, at most, as tenant at will. In neither of these characters would he have any pretentions to a lease from the appellant. But his possession has been relied on, as sufficient notice to the purchaser, that he must take the land with peril in equity of every right which the holder can assert against the seller. To this it is enough to answer, that every person who occupies the land of another as tenant, is in law a ten-amt at will, unless he can shew a lease of his lands, whereby his term is rendered *722 certain. I have already shewn that the purchaser *made every inquiry and scrutiny which a knowledge of that possession would have led to. And to me it appears that Roberts’s equity, be it what it might, would have been, and was, destroyed by his subsequent conduct to the appellant, for the reasons already mentioned.
A further reason why Roberts appears to me not to be entitled to the aid of a Court of equity, arises from this circumstance. If he was entitled to a lease at all, it was such a one as the Chancellor has directed to be made, with covenants, as in Robert Carter’s lease to Henry Taylor. I have before said that John Musgrove, and, I will now add, all who claim under him, were in equity equally bound by the terms and covenants which were to' have been contained in the lease, as they would have been at law, if the lease had been executed by both parties and recorded. Among the covenants contained in Taylor’s lease, one was that the lessee should, within three years from the date of the lease, build thereon a good dwelling-house, of certain dimensions, another house of certain dimensions, as good as common tobacco houses, and plant fifty apple-trees, and fifty peach-trees, inclose the same with a lawful fence, and at all times during the term, well and sufficiently maintain and keep all and singular the messuages, buildings, and fences, &c. in good and sufficient repair. Another covenant is, that the tenant should not, without license in writing, work more than four labouring hands; nor commit or suffer any waste; nor sell or dispose of the premises without license; nor suffer any of the wood or timber thereon to be disposed of otherwise than for the building fences, and necessary uses of the plantation ; and finally, that in case of breach or failure of any part of the above covenants, the lessor, his heirs and assigns, might re-enter, and hold the land, as if that deed had never been made.
Equity considering that to be done which ought to have been done, will refer the commencement of the lease to the time when Robert Carter made the promise to Smith, to grant a lease to John Musgrove, for the two remaining lives. Although it should be contended that the infancy of *John Musgrove should protect him from forfeiture, on account of the non-performance of the covenants on his part; yet his infancy expired, as I have before noticed, in January, 1788. Erom that period his infancy could be no protection : Roberts purchased in September, 1791, three years and a half after John Musgrove came of age, six months after the time when the improvements ought to have been made, supposing John Musgrove’s lease to have been dated the day he came of age. Two years and a half more elapsed before Jones’s purchase from Charles Carter and from Mr. Pendleton was finally completed. In his answer, by way of defensive allegation, and as a reason why he should not be compelled to make a lease according to the prayer of the bill, he states, “that there are no improvements on the lot in dispute, such as required by the leases, and the land is very much cleared, and abused.” The fact thus put in issue by the answer goes to a full denial of the plaintiff’s equity. The depositions of John Taylor, Nathaniel Smith, Thomas Pollard, and Daniel Eicklin, established the fact beyond the possibility of doubt, there being no conflicting testimony with respect to it. The latter mentions, “that he once saw Roberts setting up a large kiln of wood for coals, which have since been burnt and carried away, and believes he saw another.” This was not merely permissive, but wilful waste. It is a principle in equity, that he who demands the execution of an agreement ought to shew that there has been no default in him, in performing all that was to be done on his part. Por, if either he will not, or, through his negligence, cannot, perform the whole on his side, he has no title in equity, to the performance of the other party; since such performance could not be mutual; nor will equity decree a specific performance, in his favour, especially if circumstances are altered, (a) To say nothing of the non-performance of the covenants respecting buildings, orchards, and keeping the premises in repair, what compensation can Roberts now make for the waste and destruction which it is thus proved he has committed? Will equity decree in favour of a party who *comes into its Court with such unclean hands? Will it declare that the appellant was not equally entitled to the benefit of the covenants intended to have been comprised in the lease, as the appellee? -And, if so, will it relieve the appellee against a judgment at law, which, for aught that appears to the contrary, the appellant might have been entitled to, though Robert Carter, Charles Carter, or Edmund Pendleton had sealed the lease which the Court of Chancery have directed the appellant to execute; I think not, and for all these reasons am for reversing the "decree, and dissolving the injunction, &c.
JUDGE ROANE.
This case, considered independently of any unauthorised acts of commission or omission, in relation to the promises, on the part of the appellee, or those under whom he claims, and supposing the legal title acquired by Mr. Jones, to be out of the case, would be very strong in favour of the appellee. I should, in that view, probably get over the objection that the particulars of the title of the appellant are not set out and deduced in the bill; nor should I have much doubt but that the case of the appellee (taking Taylor’s lease as a model, and founding a construction upon the whole instrument) would justify the title and entry of William Musgrove’s heir, from whom the appellant claims. The case, however, as it is, and considered in relation to Jones, lies within a narrow compass, and I shall not, therefore, enter particularly upon the above topics.
It cannot be doubted but that Musgrove’s lease, had it been obtained, would have contained stipulations on his part for the building and repairs of houses, and the planting of orchards; as also for the keeping a limited number of hands on the *723 premises, and against the destruction and carrying away of timber &c. Considered as a lease for lives, which might at any time expire, the former stipulations ought to have been forthwith performed, else there might have been no houses nor orchards on the premises for the next tenant, and thus a beneficial lease to others might *have been prevented; and the covenants of the latter class, if broken, inflicted a lasting damage upon the inheritance.
On the testimony, none of these stipulations have been complied with, and yet the appellee has to contend against a legal title. It is supposed that a cause of forfeiture in the premises, incurred by those under whom Roberts claims, and not waived by some act of Jones, or those under whom he claims, would bind Roberts, as much as one committed by himself, and in the time of the present appellant. But it is shewn in evidence, in addition, that there is not only a neglect to build, and plant orchards, and keep them in repair, by Roberts, after Jones’s title accrued, and up to the present time, but also that Roberts himself burnt coal and carried it off the premises. This (to say nothing of the injuries committed on the land by extensive clearings) was long after any of those acts of Robert Carter or Charles Carter which have been relied upon to import a waiver of the forfeitures. There is nothing, after this, which can be set up as having that effect, but the receipt of rent by Pendleton’s agents. As for such acceptance on the part of Jones, he expressly» denies that he ever received any after the purchase from Carter: the only question on this ground then, is, whether the receipt of rent by Pollard for E. Pendleton, of 21st of February, 1795, (or, indeed, any other receipt for rent,) could have that effect.
It is here to be remarked, that, by Taylor’s lease, the rent was to be paid at the house of the lessor in Westmoreland County: and can it be reasonably inferred that the lessor knew of breaches of covenants committed, perhaps, two hundred miles off, or that he meant to release them? Certainly not. The case of Doe, ex dem. Cheny, v. Batten, (a) shews us that the question always is, quo animo the rent was received, and what was the real intention of both parties. To say that this acceptance amounted to waiver of the forfeiture incurred by» non-performance of the covenants, which were to be performed on the land, would amount to a release of such covenants in all cases, unless indeed the lessor had changed his stipulation as to the place *of receiving the rents, and agreed to receive them on the premises, or had bound himself to keep an agent on or near the premises; neither of which he has done, or was bound to do, in this case.
On the ground, then, that the mere acceptance of rent has not the effect of waiver in the case before us; that the appellant has got the law on his side by the recovery in ejectment; and that the appellee, or those under whom he claims, have committed material wrong and injury, in relation, as well to the temporary, as the permanent interests of the inheritance, I am of opinion, that the appellee is not entitled to arrest the legal title of the appellant, and that the decree should be reversed and bill dismissed.
JUDGE FLEMING.
There being a judgment at law against the appellee for the land in controversy, he comes into a Court of Equity for relief, in which he states his equitable title to the premises to be, that in February, 1767, James Dane, the agent of Robert Carter, then proprietor of the land, gave to William Mus-grove, under whom the appellee claims, a written promise that he should have the lot in question for three lives, and put him in possession: that about the year 1779 or 1780, (William Musgrove being then dead,) Robert Carter promised Nathaniel Smith, the administrator of Musgrove, and guardian to his children, to make a lease, conform-ably to the paper signed by Dane, and send it up; which paper was left with the said Robert Carter, for that purpose; but a lease was never made: that afterwards Robert Carter conveyed the land, by a deed of compromise, to Charles Carter, who .sold and conveyed it to Joseph Jones, the appellant. The most favourable situation in which Roberts can expect to be put, is, that he stand in the place of Musgrove, and Mr. Jones in the place of Robert Carter; and that a lease should have been made by the latter immediately after the written promise of Lane, or in the year 1779 or 1780, when Smith, the administrator of Mus-grove, and guardian of his children, applied for one. We are next to inquire what kind of a lease he had a right to expect, and the only guide we have on the subject is a copy of a *lease from Robert Carter to Henry Taylor, another tenant on the land, dated the 16th of October, 1755, referred to in the decree, and spread upon the record, in which there are several important covenants to be performed by the tenant, as have been stated by one of the judges who has preceded me. It is presumed that neither Musgrove, nor those who claim under him, had any just pretensions to a lease on terms more favourable than those in that above recited; and when the appellee came into a Court of Equity, for relief against a judgment at law, he should have appeared with clean hands and a pure front, and shewn that he had himself done equity, by fulfilling the several covenants contained in the recited lease; but so far was he from having done so, that it is in evidence, by the testimony of four witnesses, to wit, Taylor, Smith, Pollard, and Ficklin, that the premises are in a ruinous state, that neither fruit-trees have been planted, nor houses erected, agreeably to the covenants aforesaid, and that such as have been erected, were, at the time of taking the depositions, rotting and tumbling down. And it is moreover proved by the deposition of Ficklin, that the present tenant, Roberts, committed actual waste, by cutting wood, and burning charcoal, and conveying it off the premises.
It seems almost unnecessary to remark, that it is of the highest importance to the proprietors of lands, let out on leases, and *724 especially on long leases, that the covenants contained in them, for the improvement of the lands, and for the prevention of waste, should be strictly and punctually fulfilled; and I shall only add, that it is my opinion that the appellee, by his unwarrantable conduct in failing to erect the buildings, and to plant the frdit-trees mentioned in the covenants; and also in not only permitting, but actually committing, .waste on the premises, has forfeited his equitable title, if any he had, and that the decree ought to be reversed, the bill dismissed, and the appellant, or his representatives, (he being dead,) allowed the benefit of the judgment at law.'
By the whole Court, the decree of the Superior Court of Chancery reversed, and the bill dismissed.

 1 Wash. 017, 888, 33!).

 See Cowp. 245.

 1 Fonb. 391, 392.

 Cowp. 215,